CHAUNCEY W. MOORE and others, *v.* CHARLES GOEDEL and RICHARD ARNTZ.

Where the action is brought to recover damages for an overflow of premises, occasioned by leaving open the faucet in a water-closet, occupied in common by plaintiffs and defendants, it is incumbent on the plaintiffs to show that the parties sued caused the overflow, before he is entitled to recover.

The premises being occupied in common, no presumption arises that the overflow was occasioned by the neglect of the defendants.

APPEAL from judgment of Superior Court of New York. The action was to recover for damages sustained by the plaintiffs by means of an overflow of the Croton water upon their premises, alleged to have occurred from the negligence of the defendants.

The cause was tried before Mr. Justice BOSWORTH and a jury in June, 1860, and resulted in a verdict for the defendants. It appeared on the trial that in August, 1857, the plaintiffs, jobbers of dry goods, occupied the cellar, basement and first floor of the building corner Barclay and Church streets, in the city of New York, the building extending through from Barclay street to Park Place. The firm of William D. Cromwell & Co. hired all the rest of the building, and occupied it. The defendants, under an agreement with Cromwell & Co., were in partial occupation of the third loft of the building, but not in the exclusive possession of any part of it. They had the privilege of storing goods and doing business upon a portion of the third loft, but in entire subordination to the control of Cromwell & Co. They had no right to any key to any part of the premises, and no right of access to any part until after Cromwell & Co. had entered in the morning, and they had to leave before Cromwell & Co. left at night. No portion of the premises occupied by them was inclosed. They used that portion of the third floor nearest Park Place. There was unobstructed access on the part of Cromwell & Co., and their clerks and porters, to every part of the premises occupied by them. Some time before the overflow of the Croton water, hereafter to be

mentioned, in consequence of complaints of the defendants of the noise of Cromwell & Co.'s clerks and porters, Cromwell gave orders for a partition to be erected in the third loft, so that the defendants had that part of the loft on Park Place side of the partition, but the part was as accessible as before to Cromwell's employees.

On the second floor of the premises there were two water closets, twelve or fifteen feet apart. In each there was a wash-basin and water closet, and both were partly used. In the one on the Barclay street side the water-closet was used, and in the one nearest Park place the wash-basin was used. The water-closet was used by Cromwell & Co.'s men.

. The plaintiffs had the exclusive control of the cellar, in which was the main cock, by turning off which the water could be prevented from going to any part of the building. Shortly after Cromwell & Co. went to the premises there was an overflow of the Croton, which injured their goods. Cromwell thereupon sent down his porter every night to shut off the water. This was continued until the plaintiffs objected, and Mr. Stowell, one of the plaintiffs, promised that he would see to it, and have it turned off himself.

During the night of the 5th of August, 1857, an overflow of water occurred; the water running from the water-closet and wash-basin on the third floor nearest Park place, and down through the sky-light upon the plaintiffs' goods below, that were damaged thereby; and for this the action was brought. The evidence showed that the overflow occurred by reason of a wire connected with a valve being caught so that the valve did not close, and to a stoppage of the waste pipe below the floor. There was no testimony connecting the defendants with these derangements of the water fixtures, nor showing that they did not exist before the defendants occupied the premises; nor was there any testimony, on the part of the plaintiffs, showing that the water closet or faucet from which the overflow came had ever been used by the defendants, but, on the contrary, the defendants and their employees testified that they had never used either. When the defendants went to the premises, their porter, Mitchell,

tried to get water from the faucet, but could not, and was told by Cromwell's men that it was of no use — that no water could be got on that loft. He, from that time always, as he testified, kept the tap closed, and never again tried to get water from it, but got all the water used from the first loft. Mitchell was succeeded by a porter by the name of Rothstein, whose attention was called to the tap when he entered defendants' employment; and who was instructed not to touch the pipes or tap. He testified that it was closed when he first saw it, he never turned it, or never attempted to get water out of it. The defendants, also, testified that they never attempted to use either the faucet or water-closet, or never saw them used.

A salesman of the plaintiffs, named Wells, first discovered the overflow. He got to the plaintiffs' store about half-past six o'clock in the morning. As he entered the store he heard the water dripping, and found the floor covered with water; raised the shutters on Barclay street, from the inside, to get light; then commenced removing goods from where the water was dripping; moved silks, kid gloves, &c.; they were under the sky-light, and that vicinity; he continued to remove them until seven o'clock, when one of the porters came in, who helped; two more of the porters arrived, when he then told one of them to go down in the cellar and shut the water off. This was at half-past seven o'clock. They continued moving the goods until the lofts were opened by one of Cromwell & Co.'s porters. The dripping of water from above continued until about eight o'clock, but not much after the main cock in the plaintiffs' cellar had been turned. One of the plaintiffs' porters went up to the third loft with Cromwell's porter. No water was running when they got there. It had been running from the water-closet and wash-basin nearest Park Place and the part of the loft used by defendants.

The plaintiffs gave evidence, by several witnesses, as to the nature and extent of the damage done to the goods by wetting, the means used to restore them, and the loss sustained by the plaintiffs by means of the goods being wet.

The judge charged the jury, among other things, as follows:

1. That, if they believed, from the evidence, that defendants had not exclusive charge and control of the premises when the overflow occurred, but held the same as tenants of Cromwell & Co., and subject to the conditions mentioned in the testimony of the witness, Jacob C. Goedel (the witness who testified to the agreement of Cromwell & Co. in respect to the defendants' occupation), although there might be loss and injury resulting from the overflow, it would not follow, as a matter of course, that the defendants were liable. There might be an injury for which Cromwell & Co. or the defendants would alone be liable. On suing either firm, in order to recover, the evidence must show satisfactorily that the injury was caused by the negligence of the persons sued. In the present case, before finding a verdict for the plaintiffs, you must be satisfied that the negligence of the defendants, or of their servants, caused the injury.

2. That if it was the common understanding between Cromwell and Co., and the defendants, with the plaintiffs, well understood and acted upon between them, that the plaintiffs should shut off the water in the basement at night, and if the plaintiffs neglected to do so on the occasion in question, then the plaintiffs' carelessness or negligence contributed to the loss. Both parties being in default, the plaintiffs could not recover.

3. That if the jury believe the testimony of the witness, James McDowell (and the same being uncontradicted, they were bound to believe it), that the plaintiffs objected to Cromwell's men coming into their premises, and turning off the water; that McDowell went down to see them about it by Cromwell's direction, and had the interview with Stowell to which he refers, and that the plaintiff Stowell then said to him that they would take charge of it or see to it themselves; that the plaintiffs thereby assumed the duty of turning it off, and neglecting so to do, cannot recover of the defendants for the loss occasioned by the overflow. It was easy for the plaintiffs to call Mr. Stowell, if they had any explanation to

give or denial to make in respect to the testimony of McDowell as to what was said at this interview.

4. That if the witness, Wells, knew where the cock was which shut off the water from the defendants' premises, he was bound, if the fact occurred to his mind, to turn the water off before attending to saving the goods, and if he neglected to do so, as soon as it could be reasonably done, if the leakage might have been in part checked by his so doing, the jury must consider how far the loss could have been thereby diminished, and if they found for the plaintiffs, make such allowance therefor as the evidence satisfies them was just.

To each of which points of said charge above specified (as the case states), the plaintiffs then and there excepted.

The plaintiffs requested the court to charge the jury, that any promise or engagement of plaintiffs to Cromwell & Co. to turn off the water at night could not inure to the benefit of the defendants, and that there was no sufficient consider ation to sustain any such promise. The court refused so to charge, and the plaintiffs excepted. The jury found a verdict for the defendants.

The plaintiffs appealed from the judgment entered in favor of the defendants to the General Term, where the same was affirmed, and they now appeal to this court.

*L. K. Miller*, for the plaintiffs.

*Andrew Boardman*, for the defendants.

Wright, J. It may be that the exception to the judge's charge is too general to be available ; but as this objection is technical, and I am of the opinion that there was no error in the instructions given prejudicial to the plaintiffs, it need not be pressed.

The injury to the plaintiffs resulted from an overflow of the Croton water that had been introduced into the building of which they were occupants of the cellar, basement and first floor. This overflow occurred at night, from water fixtures in the third loft of the building, and flooded to some extent the plaintiffs' premises, injuring their goods. The firm of William D. Cromwell & Co. were the lessees and occu-

pants of all the building from the first floor upward. The defendants were. in the partial occupation of the third loft, under an agreement with Cromwell & Co., but not in the exclusive possession of any part of it. They had the privilege of storing goods and doing business upon a portion of the third loft, but in entire subordination to the control of Cromwell & Co. They had no right to any key to any part of the premises, and no right of access to any part until after Cromwell & Co. had entered in the morning, and had to leave before Cromwell & Co. left at night. No portion of their occupation was inclosed, and there was unobstructed access on the part of Cromwell & Co. and their employees to every part of the premises occupied by them.

To entitle the plaintiffs to a recovery, it was necessary for them to have shown that the parties sued caused the water to overflow their premises. . Had the defendants been in the exclusive possession of the loft in which the closet and washbasin, from which the overflow came, were located, it would, probably, have been sufficient *prima facie* to have proved the injury and where the overflow occurred. In such a case, where the occupation and right to use the water fixtures is exclusive, the party is responsible for their proper use and proper care, and liability attaches on proof that negligence has occurred and damage has ensued. But that was not this case. Cromwell & Co. were the tenants of the premises in which the water apparatus was situated. They gave to the defendants only a qualified possession of a part, continuing themselves to have access to the whole, and. retaining the control, and actually claiming and exercising, day by day, the final supervision of the premises after the defendants had left at night. The latter had their permission to use the water-closet and faucets on the end of the loft towards Park place, from which the overflow came, but the control, management and care thereof was in Cromwell & Co., as tenants of the premises. Under such circumstances, the defendants could only be held liable upon proof that their negligence, or that of their employees, caused the mischief complained of. The judge was, therefore, right in his instruction to the

jury that, before finding a verdict for the plaintiffs, they must be satisfied that the negligence of the defendants or their servants caused the injury. Indeed, instead of doing any injustice to the plaintiffs in this respect, I quite concur with the court below, that, in view of the proof, a peremptory instruction to the jury, that the plaintiffs were not entitled to recover, would have been proper. All that the plaintiffs showed was, that the flow was from a water-closet or faucet connected with the Croton water, in that part of the third loft which the defendants occupied in a limited way, and that it resulted from the use of the water-closet, or carelessly leaving open the faucet underneath the wash-basin. The proof was uncontradicted and explicit that neither the water-closet nor the faucet underneath the wash-basin had ever been used by the defendants. As to the water-closet, for aught that appeared, the derangements which produced the flow from it might have existed before the defendants went to the store; at least, there was no testimony connecting them with the disarrangement of its valve, or the stoppage in the waste pipe. The defendants used the wash-basin, but all the water used was got from the loft below. They nor their employees ever used the faucet, or ever attempted to get water from it. Yet, with this uncontradicted testimony, connected with the facts that Cromwell & Co. had control and care of the fixtures, and that they were at all times accessible to them and their employees, the judge submitted the question to the jury, whether the defendants, by themselves or their servants, caused the water to overflow the plaintiffs' premises. The plaintiffs furnished no proof whatever that they did, but, on the contrary, the proof showed affirmatively that they did not. There was, in truth, no sufficient evidence to warrant the jury in finding a verdict for the plaintiffs, on the ground that the defendants' negligence caused the injury; and had they found such a verdict, it would have been the duty of the court to have set it aside.

The other exceptions of any moment relate to the effect of the undertaking of the plaintiffs to take charge of the

Croton water pipes in the cellar, and see that the water was shut off at night.

The plaintiffs sought to recover compensation for an injury which their own negligence contributed to bring upon them. The main cock, intended as a means of shutting off water from the whole building, was upon their premises and under their control. Cromwell & Co., to whom the defendants were a species of sub-tenants, had experienced the danger of overflow in the lofts, having suffered themselves from an accident of that kind shortly after they went upon the premises. They became uneasy about it, and were in the habit of sending down and shutting off the water before leaving their premises at night. This practice continued until the plaintiffs' objected to their employees coming upon their premises for the purpose; whereupon one of the plaintiffs (Mr. Stowell) was seen on the subject, and told that Cromwell was uneasy about the water, and wanted it shut off at night, when Stowell said he would see to it and have it turned off himself. They neglected to take charge of and do what they agreed to do, and what they had prevented the tenants of the lofts themselves from doing, and ask damages for the injury that they sustained in consequence of such neglect. They recognized the right of Cromwell & Co. to resort to their premises to shut off the water at night, and the propriety of having it done; the omission of Cromwell & Co. to do it (which would have prevented the whole injury complained of) was by their express request, and that request was acceded to upon the express promise of the plaintiffs themselves to see that it was done; and negligently omitting to do the very thing which, but for their agreement, the tenants of the lofts would have done themselves, an overflow ensues, and they are seeking compensation. I quite concur with the court below, that, after agreeing with the tenants of the lofts to see to it, and have the water turned off at night, if they would forbear to come on their premises, to do for them what was a sure and adequate protection against any possible overflow of the water, and which, if done, rendered no precaution on the part of the tenants of

the lofts necessary, it would be gross injustice if the plaintiffs could neglect to do what they thus agreed to do, and ask damages for the injury which they sustain in consequence.

The whole case on this point, then, was just this: Cromwell & Co., the tenants of the lofts, for their own protection, were exercising the right of cutting off the water from their premises at night. The cut-off (a stop-cock) was in the cellar of the plaintiffs; and they were in the habit of sending down and shutting off the water every night before leaving their premises. The plaintiffs at length objected to their going through or coming on their premises for the purpose; but expressly promising and agreeing to shut it off at night themselves. They omitted to do it, and an overflow in the lofts ensued, by which they were injured. The judge instructed the jury, in substance, that if it was the common understanding between the tenants of the lofts and the plaintiffs, well understood and acted upon between them, that the plaintiffs should shut off the water in the basement at night, and if the plaintiffs neglected to do it on the occasion in question, then their carelessness or negligence contributed to the loss; and both parties being in fault, the plaintiffs could not recover. There was no error in this, but, in truth, the charge might have been more strongly against the plaintiffs. The plaintiffs had no right of recovery if their negligence contributed to the loss, and that it did so was apparent from the uncontradicted evidence. The damage was from an overflow of water. They had control of the main cock, intended as a means of shutting off water from the building; they neglected those means; they promised to shut off the water at night (preventing the tenants of the lofts from doing it themselves), and neglected to do so. Their negligence not merely contributed to the loss, but it was occasioned thereby.

It is not important to consider the exception to the instructions of the judge in respect to the rule of damages, as that question was not reached by the jury.

I think the judgment should be affirmed.

All the judges concurring, judgment affirmed.